#30020-a-SRJ
**2024 S.D. 29**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

J AND L FARMS, INC.,                    Plaintiff and Appellee,

v.

JACKMAN FLORIDA WAGYU BEEF, LLC,        Defendant,

and

FIRST BANK,                             Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RICHARD A. SOMMERS
Judge

* * * *

JUSTIN M. SCOTT of
Bantz, Gosch & Cremer, LLC
Aberdeen, South Dakota                  Attorneys for defendant
                                        and appellant.


ZACHARY W. PETERSON
JACK H. HIEB
BRIANNA HAUGEN of
Richardson, Wyly, Wise
    Sauck & Hieb, LLP
Aberdeen, South Dakota                  Attorneys for plaintiff
                                        and appellee.

* * * *

ARGUED
JANUARY 10, 2023
REASSIGNED 12/20/2023
OPINION FILED **05/22/24**

#30020

JENSEN, Chief Justice (on reassignment).

[¶1.]     This case originates from a complaint filed by J and L Farms, Inc. (J&L) against Jackman Wagyu Beef, LLC (Jackman) and First Bank, alleging breach of contract, breach of guaranty, deceit, and promissory estoppel.  Following Jackman's failure to plead or defend against J&L's complaint, the circuit court entered a default judgment against Jackman.  First Bank filed a motion to dismiss for lack of personal jurisdiction, arguing that it does not have sufficient minimum contacts for a South Dakota court to exercise personal jurisdiction over it.  The circuit court denied the motion and First Bank appeals.  We affirm the denial of the motion to dismiss.

## Factual and Procedural Background

[¶2.]     J&L is a South Dakota limited liability company with its principal place of business near Claremont, South Dakota.  Jackman is a Florida-registered limited liability company with its principal place of business located in Clewiston, Florida.  First Bank is a banking corporation organized under Florida law.

[¶3.]     In late 2016, Jackman began to periodically purchase finished cattle from J&L, upon orally agreed terms.  At the time of each shipment, the parties agreed on the number of cattle to be sold and on a set price per pound, "minus shrinkage of 4%[.]"  Per the terms of each agreement, J&L shipped the cattle from South Dakota to Omaha, Nebraska, to be slaughtered.  Jackman was required to pay for the cattle and shipping before J&L shipped the cattle to Omaha.  This arrangement continued until November 2018.

-1-

[¶4.]     On November 11, 2018, Mark Hoegh, a partner and general manager of Jackman, emailed Kurtis Larson, the vice president of J&L, requesting to alter the structure of their purchase agreements. Jackman offered to continue purchasing cattle from J&L under similar terms, except that Jackman would "pay for [J&L's] cattle within 30 days[,]" of placing an order, rather than paying prior to the cattle being shipped. To secure each payment, Jackman proposed that "[J&L] will be given a bank guarantee from our banker in Florida for the payment." Jackman also agreed to pay a 25-cent premium over the standard market price. J&L eventually agreed to these new terms.

[¶5.]     As part of the new arrangement between Jackman and J&L, First Bank issued a guaranty letter to secure payment for the sale of cattle from J&L to Jackman on December 4, 2018. The letter provided that First Bank would "guarantee payment for purchases of cattle by [Jackman], 13355 Cr. 835, Clewiston, Florida to . . . [J&L], 11675 415th Ave., Claremont, SD 57432 up to $85,000." First Bank's purpose for writing the letter was "to allow the cattle from [J&L] to be purchased under the terms agreed upon between [Jackman] and [J&L]." The letter of credit was directly addressed to "Kurtis Larsen, J and L Farms, Inc" and signed by First Bank's vice president. J&L was timely paid by Jackman for this shipment of cattle.

[¶6.]     Jackman placed a second order under the new arrangement and requested J&L to ship forty-two head of yearling Wagyu cross cattle to Omaha for $1.45 per pound. In support of this request, First Bank again presented a guaranty letter, dated December 18, 2018, to secure the payment to J&L. First Bank agreed

to guaranty payment to J&L up to $85,000 for the cattle to be purchased by Jackman. After receiving the request and guaranty letter, J&L promptly shipped forty-two head of Wagyu yearling cross cattle to Omaha.

[¶7.] Jackman placed a third order under the credit arrangement in early January for forty-three head of yearling Wagyu cross cattle at $1.48 per pound. Similar to the first two guaranties, First Bank addressed a letter to J&L on January 8, 2019, to guaranty payment to J&L up to $85,000 for the cattle to be purchased by Jackman. The letter contained nearly identical language to the first two guaranty letters. Upon receipt of the order and guaranty letter from First Bank, J&L sent forty-three head of Wagyu yearling cross cattle to Omaha.

[¶8.] Jackman failed to provide full payment for the December 18, 2018, and January 8, 2019, orders. J&L alleged that Jackman owed a remaining balance of $148,427.97. J&L alleged that it had attempted to contact First Bank under the terms of the guaranties to collect the remaining balance owed by Jackman. However, according to J&L, First Bank refused to discuss the matter or make any effort to satisfy the outstanding balance.

[¶9.] On August 2, 2021, J&L filed a complaint asserting claims for payment from both Jackman and First Bank for the December and January orders along with interest, costs, and disbursements. The complaint alleged breach of contract and promissory estoppel against Jackman. It further alleged breach of guaranty, deceit, and promissory estoppel against First Bank. Jackman did not plead or defend against J&L's complaint.

[¶10.] J&L filed a motion for default judgment against Jackman seeking the amount owed for the cattle plus prejudgment interest. The circuit court entered a default judgment in favor of J&L and against Jackman in the amount of $189,167.07.

[¶11.] First Bank filed a motion to dismiss, pursuant to SDCL 15-6-12(b)(2), asserting that the circuit court lacked personal jurisdiction. In support, it argued that a scenario involving "a Florida bank, which has no presence in South Dakota, [that] was asked by its Florida-based customer to draft the two letters at issue" does not create sufficient minimum contacts in order to establish personal jurisdiction in South Dakota. Following a hearing, the circuit court denied the motion, determining that First Bank had sufficient minimum contacts with South Dakota to create personal jurisdiction. First Bank petitioned this Court for an intermediate appeal, which was granted, and presents a single issue:

> 1. Whether the circuit court erred in denying First Bank's motion to dismiss for lack of personal jurisdiction.

**Standard of Review**

[¶12.] A motion to dismiss for lack of personal jurisdiction under SDCL 15-6-12(b)(2) is a question of law that this Court reviews de novo. *Davis v. Otten*, 2022 S.D. 39, ¶ 9, 978 N.W.2d 358, 362 (quoting *Zhi Gang Zhang v. Rasmus*, 2019 S.D. 46, ¶ 17, 932 N.W.2d 153, 159). "Where, as here, a circuit court determines a motion to dismiss on the strength of the written submissions and without conducting an evidentiary hearing, we review that court's decision 'in the light most favorable to the nonmoving party []' and without according any deference to the court's factual findings." *Zhi Gang Zhang*, 2019 S.D. 46, ¶ 17, 932 N.W.2d at 159–

60 (alteration in original) (quoting *Daktronics, Inc. v. LBW Tech Co.*, 2007 S.D. 80,

¶ 3, 737 N.W.2d 413, 416).

## Analysis

[¶13.] Two conditions must be met before a South Dakota court may exercise

personal jurisdiction over a non-resident party:

> First, the court must determine that the legislature granted the court jurisdiction pursuant to South Dakota's [l]ong [a]rm [s]tatute, SDCL 15-7-2. The court must then determine that the exercise of jurisdiction comport[s] with federal due process requirements.

*Davis*, 2022 S.D. 39, ¶ 12, 978 N.W.2d at 363 (alterations in original) (internal

quotations and citations omitted). First Bank "does not challenge that the Long

Arm Statute . . . encompass[es] this matter[.]" Therefore, the determinative

question is whether the court's exercise of jurisdiction over First Bank comports

with federal due process requirements.

[¶14.] "The due process inquiry requires determining whether a non-resident

defendant had sufficient minimum contacts with the forum, such that assertion of

personal jurisdiction does not offend 'traditional notions of fair play and substantial

justice.'" *Marschke v. Wratislaw*, 2007 S.D. 125, ¶ 14, 743 N.W.2d 402, 406 (quoting

*Daktronics, Inc.*, 2007 S.D. 80, ¶ 5, 737 N.W.2d at 416). In construing this

requirement, "we have established a three step test to determine whether minimum

contacts exist and due process is satisfied." *Daktronics, Inc.*, 2007 S.D. 80, ¶ 6, 737

N.W.2d at 417 (citing *Frankenfeld v. Crompton Corp.*, 2005 S.D. 55, ¶ 17, 697

N.W.2d 378, 384). Under the three-step test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state, thus invoking the benefits

and protections of its laws. Second, the cause of action must arise from defendant's activities directed at the forum state. Finally, the acts of defendant must have substantial connection with the forum state to make the exercise of jurisdiction over defendant a reasonable one.

*Id.* (quoting *Frankenfeld*, 2005 S.D. 55, ¶ 17, 697 N.W.2d at 384).

[¶15.] To ensure due process requirements remain manageable, this Court emphasizes "an analysis of the 'quality and nature' of contacts with the forum state." *Davis*, 2022 S.D. 39, ¶ 21, 978 N.W.2d at 366 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S. Ct. 154, 160, 90 L. Ed. 2d 95 (1945)). A non-resident defendant's contacts with the forum state "must be substantial enough to cause a non-resident defendant to 'reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)).

[¶16.] First Bank argues that the three separate guaranties do not amount to sufficient minimum contacts with South Dakota because the letters were "given to a third party in Florida, who then gave the letters to a South Dakota entity (without any direction from First Bank)." From First Bank's perspective, it is a Florida-based bank without any presence in South Dakota, which performed a task at the request of its Florida-based customer, that was later used to facilitate a transaction in South Dakota. In its view, this conduct does not create sufficient minimum contacts to support the assertion of personal jurisdiction by a South Dakota court. Furthermore, because it submits that all the relevant actions directed toward South Dakota were undertaken by someone other than First Bank, it argues that it did

not purposefully avail itself of the privileges of acting in South Dakota to satisfy due process requirements.

[¶17.] On the other hand, J&L asserts that First Bank purposefully availed itself of the forum state because the guaranties were "not 'random, fortuitous, or attenuated,' but rather were purposefully directed to a South Dakota business guaranteeing payment for another." It argues that the guaranties addressed to J&L "were prepared to induce [J&L] to move forward with the shipment of cattle at Jackman's request[,]" and although First Bank did not agree to provide future guaranties, it still issued three separate guaranties which present continuous and substantial contacts with the forum state.

[¶18.] We conclude that all three requirements for minimum contacts between First Bank and South Dakota are satisfied. First Bank purposefully availed itself of the privileges of acting in South Dakota. First Bank directly and intentionally injected itself into the commercial relationship between Jackman and J&L to facilitate ongoing purchases of South Dakota cattle by providing three guaranty letters. Each guaranty letter was presented by First Bank to and for the benefit of "Kurtis Larsen and J and L Farms, Inc, 11675 415th Ave, Claremont SD . . . ." Each letter provided that "[t]he purpose of this letter is to allow the cattle from [J&L] to be purchased under terms agreed upon between [Jackman and J&L]." Notwithstanding the fact that Jackman may have actually transmitted the guaranties to J&L, they were expressly directed to J&L, signed by an officer of First Bank, and unambiguously guarantied payment up to $85,000 to J&L for the purchase of cattle.

[¶19.] As the United States Supreme Court has explained in discussing the "purposeful availment" consideration:

> [W]here the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475–76, 105 S. Ct. 2174, 2183–84, 85 L. Ed. 2d 528 (1985) (internal citations omitted). First Bank should have reasonably anticipated being haled into South Dakota courts by virtue of its ongoing activities in guaranteeing payment for each of Jackman's purchases of South Dakota cattle. *See World-Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S. Ct. at 567 (A defendant purposefully avails himself when his "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.").

[¶20.] Secondly, the cause of action against First Bank arose from its *activities directed at* South Dakota. First Bank relies on the absence of a physical presence in South Dakota to support its argument that its activities were not directed at South Dakota. The United States Supreme Court has stated that while physical presence can be an important consideration for personal jurisdiction, "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King Corp.*, 471 U.S. at 476, 105 S. Ct. at 2184. Thus, as "long

as a commercial actor's efforts are 'purposefully directed' toward residents of another State, [the Court has] consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* (citations omitted). In other words, it is the "quality and nature" of the defendant's activities directed at the forum state that are determinative. *Davis*, 2022 S.D. 39, ¶ 21, 978 N.W.2d at 366 (citing *Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. at 160).

[¶21.] First Bank's activities were both purposefully directed at South Dakota and were ongoing. First Bank provided three guaranties for the purchase of cattle to be shipped by J&L from South Dakota. Each guaranty issued by First Bank was addressed and directed to and for the benefit of J&L, a South Dakota corporation. Further, each guaranty was instrumental to induce and facilitate the shipment of cattle by J&L from South Dakota. The undisputed evidence in the record shows that J&L and Jackman intended to continue their ongoing relationship for the purchase of South Dakota cattle, but doing so depended upon First Bank continuing to provide payment guaranties to J&L. First Bank's contacts with South Dakota were in no way random, fortuitous, or attenuated, as each guaranty was issued for the benefit of J&L to induce credit sales of cattle that were raised in, located in, and shipped from South Dakota.

[¶22.] Finally, the acts of First Bank had a "substantial connection with South Dakota so as to make the exercise of jurisdiction [over First Bank] reasonable." *Daktronics, Inc.*, 2007 S.D. 80, ¶ 16, 737 N.W.2d at 419. This Court has recognized that ongoing relationships between citizens of two different states may create the minimum contacts necessary to satisfy the Due Process Clause. In

finding that a California defendant had minimum contacts with South Dakota in *Daktronics, Inc.*, we recognized the significance of the defendant's knowledge that "she was entering into an ongoing relationship with a South Dakota corporation and assuming obligations that would directly affect the corporation." 2007 S.D. 80, ¶ 15, 737 N.W.2d at 419. As this Court explained in *Daktronics, Inc.*, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Id.* ¶ 11, 737 N.W.2d at 418 (quoting *Burger King Corp.*, 471 U.S. at 473, 105 S. Ct. at 2182). The November 11, 2018, email shows that Jackman and J&L intended an ongoing relationship for the credit sale of South Dakota cattle, premised on the bank guaranties. Thereafter, First Bank issued three guaranties to J&L to facilitate the purchase of South Dakota cattle which would have continued, if not for Jackman's default.

[¶23.] This case is unlike *Kustom Cycles, Inc. v. Bowyer*, where the Court determined that the relationship between the plaintiff and defendant involved a single contract that the Court stated could "hardly be considered anything more than a 'one-shot deal.'" 2014 S.D. 87, ¶ 23, 857 N.W.2d 401, 411. *Kustom Cycles* distinguished the facts from those present in *Daktronics, Inc.*, by noting that "the intention to establish a common venture extending over a substantial period of time is a more important consideration." *Id.* ¶ 22, 857 N.W.2d at 411 (quoting *Daktronics, Inc.*, 2007 S.D. 80, ¶ 10, 737 N.W.2d at 418).

[¶24.] First Bank argues that a guaranty relationship is insufficient to create minimum contacts and relies upon cases from other jurisdictions holding that in the

absence of a showing of specific inducement, reliance upon a guaranty alone "would not comport with due process[.]" *See Long John Silver's, Inc. v. DIWA III, Inc.*, 650 F. Supp. 2d 612 (E.D. Ky. 2009); *Ark. Rice Growers Co-op Ass'n. v. Alchemy Indus., Inc.*, 797 F.2d 565 (8th Cir. 1986). First Bank argues that it did not induce J&L to do business with First Bank or Jackman and "the only inducement . . . conveyed to [J&L] came from Jackman." To support this proposition, it states that because it never directly communicated with or directed any action toward J&L, it could not induce J&L into doing business.

[¶25.] A number of courts have concluded that the execution of a guaranty agreement for the benefit of a resident in the forum state is sufficient to create minimum contacts, even in the absence of a direct communication or a physical presence in the forum state. *See Hand Cut Steaks Acquisitions, Inc. v. Lone Star Steakhouse & Saloon of Neb., Inc.*, 905 N.W.2d 644, 666 (Neb. 2018) ("Where a guarantor takes on obligations that are uniquely tied to and uniquely affect a particular location, it is not unreasonable for courts of that state to exercise personal jurisdiction over the guarantor in connection with claims arising from or related to those obligations."); *Peoples Bank v. Frazee*, 318 S.W.3d 121, 130–31 (Mo. 2010) (A finding that "without [the nonresident's] guaranty, [the resident bank] would not have executed a new promissory note" along with the fact that the case was not "a single isolated transaction which involved the unilateral activity of [a nonresident,]" led the court to conclude that minimum contacts had been satisfied.); *Quality Pork Int'l v. Rupari Food Servs., Inc.*, 675 N.W.2d 642, 651 (Neb. 2004) (finding that a corporation's promise to guaranty the purchase of products "induced

[a resident seller] to ship products" to an out of state buyer because the seller would not have continued doing business with the buyer without the "[guarantor's] promise to pay for products shipped"); *Panos Inv. Co. v. Dist. Ct. In & For Larimer Cnty.*, 662 P.2d 180, 183 (Colo. 1983) ("To require a guarantor to defend in the courts of the state where the guaranteed obligation is payable is fully consistent with 'traditional notions of fair play and substantial justice.'" (citing *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 154)); *United States v. Rollinson*, 629 F. Supp. 581, 587 (D.D.C. 1986), *aff'd*, 866 F.2d 1463 (D.C. Cir. 1989) (The guarantor's "out-of-state act has had an effect within this jurisdiction sufficient to render him amenable to suit" because it benefitted him at least indirectly and "entities within this jurisdiction relied upon that act.").

[¶26.]     First Bank's guaranties demonstrate unequivocally an intent to induce J&L to sell and ship cattle out of South Dakota on credit. These guaranties were not general in nature but bound First Bank to pay J&L up to $85,000 for each of the three shipments of cattle. It is inconceivable that a South Dakota farmer would otherwise agree to ship their cattle out of state to be slaughtered, based solely upon an unsecured promise that "we will pay for your cattle within 30 days." First Bank's guaranties operated as the security J&L needed to confidently conduct business with Jackman and induced J&L to sell its cattle on credit, on an ongoing basis.

[¶27.]     This Court has previously stated that "contract[ing] with an out-of-state party *alone* [does not] automatically establish" personal jurisdiction. *Marschke*, 2007 S.D. 125, ¶ 16, 743 N.W.2d at 408 (citation omitted). But we have

also rejected "any talismanic jurisdictional formulas; 'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* ¶ 15 n.6, 743 N.W.2d at 407 n.6 (alteration in original) (quoting *Burger King Corp.*, 471 U.S. at 485–86, 105 S. Ct. at 2189). The facts of this case support the court's exercise of specific personal jurisdiction over First Bank based upon the nature of the ongoing relationship and the specific inducement directed toward J&L that encouraged it to continue to sell South Dakota cattle to Jackman. First Bank could reasonably anticipate being haled into court in South Dakota for actions arising from this ongoing relationship for the credit sale of cattle between J&L and Jackman, that wholly depended upon First Bank's contractual guaranties to J&L.

[¶28.]    For the above-mentioned reasons, First Bank had "certain minimum contacts with [South Dakota] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 158 (citations omitted). We affirm the circuit court's decision to deny First Bank's motion to dismiss for lack of personal jurisdiction.

[¶29.]    SALTER and DEVANEY, Justices, concur.

[¶30.]    KERN and MYREN, Justices, dissent.


KERN, Justice (dissenting).

[¶31.]    I respectfully dissent from the majority opinion's conclusion that First Bank had sufficient minimum contacts with South Dakota for the exercise of personal jurisdiction.

[¶32.] South Dakota courts may exercise personal jurisdiction over nonresident defendants when two conditions are met. *See Int'l Shoe Co. v. Washington*, 362 U.S. 310, 319–20, 66 S. Ct. 154, 160, 90 L. Ed. 95 (1945); *Davis v. Otten*, 2022 S.D. 39, ¶ 12, 978 N.W.2d 358, 363. First, the circuit court must determine whether "the [L]egislature granted the court jurisdiction pursuant to South Dakota's [l]ong [a]rm [s]tatute, SDCL 15-7-2." *Davis*, 2022 S.D. 39, ¶ 12, 978 N.W.2d at 363 (last three alterations in original). Second, the exercise of jurisdiction "must comport[] with federal due process requirements." *Kustom Cycles, Inc. v. Bowyer*, 2014 S.D. 87, ¶ 9, 857 N.W.2d 401, 406 (alteration in original). As the majority opinion notes, there is no dispute that the first condition is met. Therefore, we consider only whether First Bank had sufficient minimum contacts with South Dakota such that exercising specific personal jurisdiction over First Bank does not offend due process.

[¶33.] Specific personal jurisdiction may exist when a corporation does not have continuous contact with the forum, but the litigation "aris[es] out of or relate[s] to the defendant's contacts with the forum[.]" *Daimler AG v. Bauman*, 571 U.S. 117, 127, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014) (first two alterations in original); *Marschke v. Wratislaw*, 2007 S.D. 125, ¶ 12, 743 N.W.2d 402, 406. At its core "the constitutional touchstone remains whether the defendant *purposefully* established 'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985) (emphasis added).

[¶34.] The minimum contact requirement protects an individual from "being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Id.* at 471–72, 105 S. Ct. at 2181 (quoting *Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. at 160). It also provides litigants with "fair warning that a particular activity may subject [them] to the jurisdiction of" another state's courts. *Id.* at 472, 105 S. Ct. at 2182 (alteration in original). Therefore, a "defendant's conduct and connection with the forum must be such that he could reasonably anticipate being haled into a forum court." *Marschke*, 2007 S.D. 125, ¶ 14, 743 N.W.2d at 406 (citation omitted).

[¶35.] In examining whether a party has established sufficient minimum contacts with South Dakota such that exercising specific personal jurisdiction comports with due process, we apply a three-step analysis:

> First, the defendant must *purposefully* avail himself of the privilege of acting in the forum state, thus invoking the benefits and protections of its laws. Second, the cause of action must arise from [the] defendant's activities directed at the forum state. Finally, the acts of [the] defendant must have substantial connection with the forum state to make the exercise of jurisdiction over [the] defendant a reasonable one.

*Davis*, 2022 S.D. 39, ¶ 20, 978 N.W.2d at 366 (alterations in original) (emphasis added) (citing *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 10, 857 N.W.2d at 407).

[¶36.] While these three prongs serve as a guide to our analysis, our focus remains on the "quality and nature" of the defendant's contacts. *See Davis*, 2022 S.D. 39, ¶ 21, 978 N.W.2d at 366 (citation omitted). Where "minimum contacts" allow a defendant to enjoy the "benefits and protection[s]" of the laws of a forum state, and where "'traditional notions of fair play and substantial justice' are

upheld, a court may exercise personal jurisdiction." *See id.* (alteration in original) (citation omitted).

### 1. Purposeful availment of the privilege of acting in the forum state.

[¶37.] As the majority opinion notes, purposeful availment arises where the defendant "deliberately" created "'continuing obligations' *between himself and residents of the forum*." *Burger King Corp.*, 471 U.S. at 475–76, 105 S. Ct. at 2184 (emphasis added) (citations omitted). However, a defendant does not purposefully avail themselves to the forum "simply because the defendant knew the plaintiff was a resident of the forum, or because the defendant knew the plaintiff's performance would occur in the forum." *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 14, 857 N.W.2d at 408. The proper "'minimum contacts' analysis looks to *the defendant's contacts with the forum* State itself[.]" *Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 1122, 188 L. Ed. 2d 12 (2014) (emphasis added) (citing *Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. at 154).

[¶38.] According to the majority opinion, the guaranties entered into by two Florida residents, First Bank and Jackman, were sufficient to establish purposeful availment. However, while the guaranties were a contract between two non-residents, this Court has made clear that a contract does not vest a forum with personal jurisdiction over an out-of-state defendant "simply because the defendant is [a] party to the contract[.]" *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 14, 857 N.W.2d at 408 (citing *Marschke*, 2007 S.D. 125, ¶ 16, 743 N.W.2d at 408). We have repeatedly stated that an "individual's contract with an out-of-state party [cannot] *alone* . . . automatically establish sufficient minimum contacts in the other party's

home forum[.]"[1] *Marschke*, 2007 S.D. 125, ¶ 16, 743 N.W.2d at 408 (quoting *Burger King Corp.*, 471 U.S. at 478–79, 105 S. Ct. at 2185); *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 14, 857 N.W.2d at 408.

[¶39.] This rule applies with equal force to guaranties. As multiple other courts have held, the existence of a guaranty does not per se vest a foreign sovereign with personal jurisdiction over a nonresident guarantor.[2] *See F.D.I.C v. Hiatt*, 872

---

1. The majority opinion seems to suggest this longstanding rule is a "talismanic jurisdiction formula." Stating that a guaranty alone does not establish the minimum contacts necessary to satisfy due process, however, is neither new nor talismanic. At its core, a guaranty is simply a contract. And this Court has long accepted the "contract plus" approach expressed by the United States Supreme Court in *Burger King*. *See Marschke*, 2007 S.D. 125, ¶ 16, 743 N.W.2d at 408 (quoting *Burger King Corp.*, 471 U.S. at 478–79, 105 S. Ct. at 2185); *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 14, 857 N.W.2d at 408. Under this approach, the existence of a contract does not, on its own, comport with the requirements for due process to establish jurisdiction. Rather, the due process requirement is satisfied through the existence of some "plus" factor; in other words, supplemental contacts showing that the defendant "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of [South Dakota] laws." *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.*, 764 F.2d 928, 933 (1st Cir. 1985) (first alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958)). J&L's connection to the forum–e.g., "a South Dakota resident," "sale of South Dakota cattle," "shipped from South Dakota"–are beside the point. The minimum contacts analysis must focus on the defendant First Bank, not J&L nor Jackman. First Bank was a third-party surety for the commercial exchange between Jackman and J&L but was by no stretch an indispensable party to Jackman and J&L's endeavors.

2. Courts have found personal jurisdiction where, in addition to guaranties, a defendant had significant supplemental contacts with the forum. *See Peoples Bank v. Frazee*, 318 S.W.3d 121, 131 (Mo. 2010) (en banc) (holding that a guaranty along with defendant's active role and supplemental contacts with the forum established minimum contacts); *William A. Edison Tr. No. One v. Pattillo*, 2010 WL 5093831, at *6–7 (D. Kan. Dec. 8, 2010) (finding minimum contacts when defendant's contacts supplemental to the guaranties established continuing relationships and obligations with citizens of another

(continued . . .)

P.2d 879, 885 (N.M. 1994) (holding that defendants "did not purposefully avail themselves of the benefits and protections of New Mexico law by merely guaranteeing a loan"); *Sibley v. Superior Court*, 546 P.2d 322, 325 (Cal. 1976) (holding that a defendant did not purposefully avail himself of the benefits and protections of California law by executing a guaranty in Florida which required payments to be sent to California), *cert. denied*, 429 U.S. 826, 97 S. Ct. 82, 50 L. Ed. 2d 89 (1976); *United Buying Grp., Inc. v. Coleman*, 251 S.E.2d 610, 616 (N.C. 1979) ("The mere [a]ct of signing such a guaranty or endorsement does not in and of itself constitute a sufficient contact upon which to base in personam jurisdiction over a nonresident."); *Basic Food Indus., Inc. v. Eighth Jud. Dist. Court*, 575 P.2d 934, 936 (Nev. 1978) (holding that exercising personal jurisdiction over a guarantor who "mechanically executed the guaranty and mailed it back to the forum" violates due process); *Valero Mktg. & Supply Co. v. Gen. Energy Corp.*, 702 F. Supp. 2d 706, 717, 720 (S.D. Tex. 2010) (stating due process prevents exerting personal jurisdiction over a defendant whose only relevant contact with the forum is a guaranty).

[¶40.]     Nevertheless, the majority opinion states that several courts have concluded a guaranty "for the benefit of a resident" is sufficient to establish the minimum contacts necessary for personal jurisdiction.  But these cases are readily distinguishable from the case at hand and provide little if any support for the

---

(. . . continued)

state) (unreported); *Life Share Collateral Holdings, LLC v. Strauss*, 2013 WL 2420478, at *5 (D. Minn. June 3, 2013) (finding personal jurisdiction over guarantor who had substantial identity with debtor, record evidence showed loan depended on the execution of a guaranty, and the guaranty contained a choice of law provision applying forum's law) (unreported).

majority opinion's view. First, the majority opinion cites a Nebraska case where the guaranty at issue served as an inducement to perform a "particular action within the forum state." *Hand Cut Steaks Acq., Inc. v. Lone Star Steakhouse & Saloon of Neb., Inc.*, 905 N.W.2d 644, 665–66 (Neb. 2018). However, the guarantor in *Hand Cut Steaks* was a subsidiary of the debtor corporation's parent company and was insured under the same insurance policy as the debtor corporation. *Id.* at 654. In such circumstances, other courts have concluded that where there is a substantive identity between the guarantors and the company whose obligations they are guaranteeing, personal jurisdiction may arise. *See Ark. Rice Growers Co-op. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565, 573–74 (8th Cir. 1986). Moreover, the terms of the guaranty at issue in *Hand Cut Steaks* specifically provided that the guaranty was serving as an inducement for the transaction. 905 N.W.2d at 654, 664.

[¶41.] Likewise, the other Nebraska case cited by the majority opinion is distinguishable because the case involves specific evidence of inducement between the parties. *See Quality Pork Int'l v. Rupari Food Servs.*, 675 N.W.2d 642, 647, 652 (Neb. 2004). In that case, the plaintiff "Quality Pork agreed to again do business with Star *only because* Rupari agreed to pay for all products that Star ordered from Quality Pork." *Id.* at 647 (emphasis added). Further, in concluding Rupari had sufficient minimum contacts with Nebraska, the court noted Rupari's failure to "present a compelling case that the presence of some other consideration would render jurisdiction unreasonable." *Id.* at 652. The court held the "affidavit of Rupari's president merely set forth that it is a food servicing company which sells and resells food products such as pork and that it does not have employees, offices,

or property in the State of Nebraska. Under the facts of this case, the lack of physical presence in Nebraska is not a compelling reason that would cause the assertion of jurisdiction to be unreasonable." *Id*.

[¶42.] Here, the affidavit submitted by Joshua Whitehead, a vice president for First Bank who signed the letters of guaranties, was much more compelling. In his affidavit, Whitehead stated:

- He had no contact with J&L in relation to drafting the letters;

- All of his communications were with representatives of Jackman Florida Wagyu Beef;

- He supplied the letters to Jackman Florida Wagyu Beef, not to J&L;

- The letters were drafted at the request of Jackman Florida Wagyu Beef, not J&L;

- Neither he nor anyone from First Bank had any communication with J&L prior to the issuance of the letters or in regard thereto;

- Other than the letters, First Bank had no business dealings with J&L.

Whitehead's affidavit is far more detailed and compelling than Rupari's in *Quality Pork*. First Bank's nearly complete lack of contacts with South Dakota, particularly as to the transaction at issue, demonstrates that First Bank did not *purposefully* establish minimum contacts in South Dakota and would not have reasonably

anticipated being sued here. *See Burger King Corp.*, 471 U.S. at 474, 105 S. Ct. at 2183.[3]

[¶43.] The majority opinion suggests it would be "inconceivable" that J&L would agree to sell and ship cattle on credit. However, this Court is bound by evidence contained in the record below, and there is nothing in the record suggesting that J&L would refuse to do so. In fact, the record reflects that J&L had been conducting business with Jackman since 2016, and there is no evidence that J&L knew of a change in Jackman's financial condition that would have caused J&L to require a guaranty to continue their business relationship. The only communication between Jackman and J&L regarding the guaranty is an email from Jackman proposing a new term arrangement whereby Jackman offered to pay a higher premium price for cattle in exchange for a 30-day pay window and a guaranty from Jackman's bank. But there is no evidence indicating that J&L would not have continued transacting business with Jackman but for the guaranty, and no evidence that J&L required a guaranty before allowing any other customer to

---

3. *Panos Inv. Co. v. Dist. Ct. In & For Larimer Cnty.*, 662 P.2d 180, 182 (Colo. 1983), cited by the majority opinion, is also of little precedential value. In concluding the Colorado courts had jurisdiction over the guarantor, the court noted, "the third element [whether the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state] is met because the guarantee has a substantial connection with Colorado." However, the opinion is lacking any description of such activities beyond the guarantee.

purchase cattle on credit.[4] Therefore, even under the cases cited by the majority opinion, the guaranty in this case is insufficient to establish purposeful availment.

### 2. Activities directed at the forum state.

[¶44.] To assert jurisdiction over First Bank, the cause of action against it must have arisen from First Bank's activities directed at South Dakota. In order to satisfy this requirement, the majority opinion relies on the guaranties to find that First Bank's activities were both directed at South Dakota and ongoing. Nevertheless, as previously noted, personal jurisdiction over First Bank cannot arise simply from its contract with a South Dakota resident (J&L). *See Marschke*, 2007 S.D. 125, ¶ 16, 742 N.W.2d at 408. "[W]hen viewed through the proper lens— whether the defendant's actions connect him to the *forum*," *Walden*, 571 U.S. at 289, 134 S. Ct. at 1124, the record does not establish that First Bank "purposefully avail[ed] itself to the privilege of conducting activities within the forum, thus invoking the benefits and protections of its laws." *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 12, 857 N.W.2d at 408.

[¶45.] First Bank is not incorporated, headquartered, or licensed to do business in South Dakota. *See Marschke*, 2007 S.D. 125, ¶ 25, 743 N.W.2d at 410

---

4. *See also Consolidated Comp., Inc., v. Kern*, 2000 WL 1036186, at *3 (E.D. La. July 25, 2000) (holding that nonresident defendant was subject to personal jurisdiction in Louisiana when *guaranty explicitly stated that its purpose was to induce* the plaintiff to provide credit); *Ark. Rice Growers Co-op Ass'n.*, 797 F.2d at 573–74 (stating "*evidence* that the beneficiary of the guarantee contract *would not have entered into the transaction without the guarantees*" is a basis for jurisdiction to comport with due process (emphasis added)); *KCI Auto Auction, Inc. v. Anderson*, No. 5:17-CV-06086-NKL, 2018 WL 665313, at *4 (W.D. Mo. Feb. 1, 2018) (relying on *evidence* that the guaranty was a condition for the transaction to hold that personal jurisdiction exists).

(citing *Frankenfeld v. Crompton Corp.*, 2005 S.D. 55, ¶ 5, 697 N.W.2d 378, 381 (considering the same factors and finding minimum contacts were lacking)), and it does not advertise or provide banking products or services within the State. Furthermore, any obligation arising from Jackman's breach of contract could be satisfied with a single, lumpsum payment. *See Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 24, 857 N.W.2d at 412 (acknowledging that "a one-time obligation to pay a sum of money" cannot alone establish personal jurisdiction). Quite simply, the bare existence of guaranties is insufficient, in this case, to conclude that First Bank directed its activities toward South Dakota.

### 3. Substantial connection with the forum state to make the exercise of personal jurisdiction a reasonable one.

[¶46.] It is well established that an ongoing relationship between citizens of two different states may create minimum contacts necessary to satisfy the Due Process Clause. In analyzing this element, the majority opinion compares the present case to *Daktronics, Inc. v. LBW Tech Co.*, 2007 S.D. 80, 737 N.W.2d 413. However, that case contains significant facts not present here.

[¶47.] In *Daktronics, Inc.*, this Court sought to determine when an interstate contractual obligation created continuing obligations such that the citizens of one state would be subject to personal jurisdiction of the other. *Id.* ¶¶ 11, 12, 737 N.W.2d at 418. The contract at issue was a three-year consulting agreement between Daktronics and LBW/Tang. *Id.* ¶ 12, 737 N.W.2d at 418. In its analysis, the Court discussed LBW/Tang's supplemental contacts with South Dakota, which included:

(1) Tang telephoned, e-mailed and faxed Daktronics executives in South Dakota; (2) she visited Daktronics' headquarters in South Dakota at the expense of Daktronics; (3) while in South Dakota, Tang and Daktronics discussed a potential business relationship; (4) after her visit, Tang sent e-mails to and telephoned South Dakota; (5) Tang and Daktronics entered into a three-year consulting agreement, partially executed in South Dakota; (6) in accordance with the agreement, Tang sent status reports and reimbursement requests to South Dakota; and (7) Tang received payment for her services and reimbursement for her expenses from South Dakota.

*Id.* ¶ 9, 737 N.W.2d at 417. In holding that LBW/Tang had sufficient minimum contacts, the Court paid special attention to Tang's three-year contractual obligation "contemplat[ing] continuous contacts [and communications] between [her] and Daktronics in South Dakota," Tang "voluntarily accept[ing] the regulation of her business from Daktronics' headquarters in South Dakota," and Tang's "purposefully derived benefit" of receiving "payment for her services and reimbursement for her expenses from South Dakota." *Id.* ¶¶ 12–15, 737 N.W.2d at 418–19.

[¶48.] Here, First Bank had no physical contact with the state of South Dakota. And, while physical presence in the forum is not necessarily required, "[s]pecific jurisdiction frequently depends on physical contacts with the forum . . . [and] is generally factored into the jurisdictional determination." *Marschke*, 2007 S.D. 125, ¶ 22, 743 N.W.2d at 410 (italics omitted) (citations omitted); *Walden*, 571 U.S. at 285, 134 S. Ct. at 1122. Further, unlike in *Daktronics*, the record in this case does not contain any virtual, electronic, or physical communication by First

Bank with J&L.[5] *Cf. Denver Truck & Trailer Sales, Inc. v. Design and Bldg. Servs., Inc.*, 2002 S.D. 127, ¶¶ 13–14, 653 N.W.2d 88, 92 (holding personal jurisdiction violated due process when nonresident defendant's only contacts with the forum were one letter and two phone calls).

[¶49.]     At best, First Bank executed the guaranties and addressed them to J&L at Jackman's request. It then forwarded the completed guaranties to Jackman, who, at that point, sent them to J&L. Any communication pertaining to the purchase of cattle or the guaranties was exclusively between Jackman and J&L.[6]

[¶50.]     Based on the nature and quality of First Bank's contacts here, it is apparent that J&L has failed to establish that First Bank had "fair warning" that it could reasonably anticipate being haled into court in South Dakota based on the three guaranties that it executed in Florida and sent to its Florida-based customer. J&L failed to show any supplemental contacts between First Bank and South Dakota where First Bank's actions in connection to the guaranties invoked the benefit and protection of South Dakota's laws.

---

5.     The record reflects that J&L attempted to contact First Bank once it became evident Jackman would not satisfy its remaining balance, but First Bank never responded to J&L's inquiry.

6.     Even if First Bank and J&L did communicate about the guaranties, we have stated that "communications directed into South Dakota [are not] sufficient to establish jurisdiction," unless they in some way affect the "quality and nature of [the defendant's] contact with this forum." *Kustom Cycles, Inc.*, 2014 S.D. 87, ¶¶ 15–16, 857 N.W.2d at 408–09; *see also Denver Truck*, 2002 S.D. 127, ¶¶ 13–14, 653 N.W.2d at 92.

[¶51.]     Here, J&L failed to demonstrate that First Bank deliberately engaged in substantial activities within South Dakota.  The most J&L has shown is that the conduct of a third-party, Jackman, established a contractual relationship between First Bank and J&L.  But it is well established that it is the contacts between the defendant, the forum, and the litigation that matter, not the strength of connection between the plaintiff and the forum.  *See Kustom Cycles, Inc.*, 2014 S.D. 87, ¶ 12, 857 N.W.2d at 407.

[¶52.]     For the foregoing reasons, I would reverse and remand.

[¶53.]     MYREN, Justice, joins this writing.